**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

TERRILL E. JOHNSON, # 337439      *

Plaintiff                     *

v                          *        Civil Action No. ELH-12-2692

GARY MAYNARD, et al         *

Defendants             *
                              ***

**MEMORANDUM**

Plaintiff Terrill E. Johnson, who is self-represented,[1] filed suit under 42 U.S.C. § 1983, and pursuant to the Eighth and Fourteenth Amendments to the Constitution, alleging that defendants Gary D. Maynard and J. Philip Morgan (the "State Defendants") failed to protect him from an assault at the Western Correctional Institution ("WCI") in Cumberland, Maryland[2] and then were deliberately indifferent to his resulting medical needs. He sued defendants Janice Gilmore, R.N., Ava Joubert, M.D., Greg Flury, P.A.; and "CMS/Corizin, Inc."[3] (the "Medical Defendants"), claiming that they were deliberately indifferent in treating his resulting injury. The State Defendants and the Medical Defendants have filed separate motions to dismiss or, alternatively, for summary judgment. ECF 13 and 20. The State Defendants' motion is supported

---

[1] Johnson spells his first name as "Terrill." ECF 1. The Division of Correction shows that the inmate with the identification number corresponding to that provided by plaintiff spells his first name as "Terrell." *See* http: e//www.dpscs.stat. md.us/inmate/.

[2] Morgan was the Warden of WCI when the stabbing occurred. He is presently the Warden of North Branch Correctional Institution. Gary Maynard is the Secretary of the Maryland Department of Public Safety and Correctional Services, the cabinet-level agency in the State of Maryland that is responsible for management of all Maryland prisons and pre-release centers. The Division of Correction, a division of that Department, is responsible for operation of the state prison system.

[3] Corizon, Inc. ("Corizon"), formerly known as Correctional Medical Services, Inc. ("CMS"), is a private corporation then under contract with the State of Maryland to provide services at certain state correctional facilities. The Clerk shall amend the docket to reflect the corporate name is "Corizon, Inc."

by a declaration and one other document. The Medical Defendants' motion is supported by a declaration and about 129 pages of Johnson's medical records. Notice was sent to Johnson regarding the effect of the motions, his right to file a response in opposition, and the consequences of failing to do so. ECF 14 and 21. The motions are unopposed, and no hearing is necessary to resolve them. See Local Rule 105.6.

## BACKGROUND

An inmate stabbed Johnson in his jaw on December 22, 2010, while both men were incarcerated at WCI. Johnson's jaw later became infected. He faults the State Defendants for failing to protect him from attack and for failing to assure adequate medical treatment for his injuries. He also faults the Medical Defendants for failing to provide him with adequate treatment. In particular, plaintiff complains that he developed an infection, did not receive a "test" for his infection until May 2012, was improperly treated, and was diagnosed one and a half years later with a staph infection. ECF 1 at 5. As a result, Johnson claims he suffers drainage from his nose and the back of his throat, his left tonsil is "locked," and it feels like something is in his throat is "blocking the passage way," making it hard for him to breathe. *Id*. at 8. Plaintiff seeks damages of $250,000 from each defendant.[4] *See id*.

The State Defendants assert that Johnson's claims are barred by the affirmative defenses of failure to exhaust administrative remedies, Eleventh Amendment immunity, respondeat superior, and qualified immunity. The Medical Defendants raise respondeat superior as an affirmative defense on behalf of Corizon, Inc. and contend that the remaining Medical Defendants are entitled to summary judgment as a matter of law.

---

[4] Johnson seeks damages for "breach of contract to provide adequate medical care, and medical neglect." ECF 1 at 8. These causes of actions sound in state contract and tort law, and they do not state federally cognizable claims.

# DISCUSSION

## A. Standard Of Review

Defendants' motions are styled as motions to dismiss under Fed.R.Civ.P. 12(b)(6) or, in the alternative, for summary judgment under Fed.R.Civ.P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed.R.Civ.P. 12(d). When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metropolitan Washington Airports Authority*, 149 F.3d 253, 261 (4th Cir. 1998).[5]

A district judge has "complete discretion to determine whether or not to accept the

---

[5] In contrast, a court may not convert a motion to dismiss to one for summary judgment sua sponte, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Board Unit 200 v. Norfolk Southern Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2011 Supp.). But, this discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165–67.

To be sure, summary judgment is ordinarily inappropriate "where the parties have not had an opportunity for reasonable discovery*." E.I. de Nemours and Co. v. Kolon Industries, Inc*., 637 F.3d 435, 448 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Technologies Applications & Services. Co*., 80 F.3d 954, 961 (4th Cir. 1996)). Generally, to raise adequately the issue that discovery is needed, the party opposing the motion must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed.R.Civ.P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

In accordance with *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir.1975), Johnson was informed of his right to file a response to each motion, as well as the opportunity to submit affidavits, declarations, and other documentary evidence. ECF 14; ECF 21. As noted, Johnson has not filed an opposition to either motion. Nor has he requested an opportunity to conduct discovery. Because consideration of the exhibits will facilitate resolution of the motions, I will,

in the exercise of my discretion, consider the motions under summary judgment principles.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Electric Industrial Co. v. Zenith, Radio Corp*., 475 U.S. 574, 586 (1986). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Fourth Circuit has explained: "The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting former Fed.R.Civ.P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). However, the court must "view the evidence in the light most favorable to .... the nonmovant, and draw all inferences in [his] favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Medical Center., Inc*., 290 F.3d 639, 645 (4th Cir.2002).

Because plaintiff is self-represented, his submissions are liberally construed. *See*

*Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp.*, 477 U.S. at 323-24).

## B. The State Defendants

### 1. Administrative Exhaustion of Claims

The State Defendants urge dismissal of the suit or the award of summary judgment on the ground that Johnson has not exhausted his available administrative remedies, as required by the Prison Litigation Reform Act of 1996 ("PLRA"). It states, in part: "No action shall be brought with respect to prison conditions under [42 U.S.C.] section 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). *See also Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). The PLRA requires that, before filing suit in federal court, a prisoner "must have utilized all available remedies 'in accordance with the applicable procedural rules,' so that prison officials have been given an opportunity to address the claims administratively." *Moore*, 517 F.3d at 725 (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)).[6] Put another way, exhaustion is mandatory and unexhausted claims may not be brought in court. *See Jones v. Bock*, 549 U.S. 199 (2007).

"[F]ailure to exhaust is an affirmative defense under the PLRA. . . ." *Jones*, 549 U.S. at

---

[6] For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h).

216. An affirmative defense is the "'defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiff's . . . claim, *even if all allegations in the complaint are true.*'" *Emergency One, Inc. v. Am. Fire Eagle Engine Co.*, 332 F.3d 264, 271 (4th Cir. 2003) (emphasis added) (internal citations and some internal quotation marks omitted).  The defendant bears the burden of pleading and proof as to an affirmative defense.  *See, e.g.*, *Taylor v. Sturgell*, 553 U.S. 880, 907 (2008) ("Ordinarily, it is incumbent on the defendant to plead and prove [an affirmative] defense."); *Moore*, 517 F.3d at 725 (citing *Jones*, *supra*, 549 U.S. 199); *McNeill v. Polk*, 476 F.3d 206, 220 n.3 (4th Cir.), *cert. denied*, 552 U.S. 1043 (2007).[7]

Maryland prisoners have an available administrative grievance procedure within the meaning of 42 U.S.C. § 1997e(a), for the redress of a "grievance against an official or employee of the Division of Correction." Md. Code (2008 Repl. Vol., 2012 Supp.), § 10–206 of the Correctional Services Article ("C.S.").  Regulations promulgated by Department of Public Safety and Correctional Services ("DPSCS") concerning the grievance procedure define a "grievance" to include a "complaint of any individual in the custody of the [Division of Correction] ... against any officials or employees of the [Division of Correction] ... arising from the circumstances of custody or confinement." Code of Maryland Regulations ("COMAR") 12.07.01.01.B(8).  The Maryland Court of Appeals has indicated that the administrative grievance procedure applies to a wide variety of matters that "relate to or involve a prisoner's 'conditions of confinement.'" *Massey v. Galley*, 392 Md. 634, 651, 898 A.2d 951, 960 (2006) (citation omitted).  A suit "brought with respect to prison conditions," 442 U.S.C. § 1997e(a), includes claims of excessive force.  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

---

[7] Notably, a district court may, *sua sponte*, "dismiss [ ] a complaint where the failure to exhaust is apparent from the face of the complaint," as long as the inmate is provided the "opportunity to respond to the issue" prior to dismissal. *Anderson v. XYZ Correctional Health Services., Inc*., 407 F.3d 674, 683 (4th Cir. 2005).

In particular, an inmate in Maryland must first file his grievance pursuant to an administrative remedy procedure ("ARP") that is maintained by the institution in which he is confined. *See* C.S. § 10-206(b); *see also* COMAR 12.07.01.02.D. Within thirty days after the completion of the ARP process, the inmate may request further review by submitting a complaint to the statewide Inmate Grievance Office ("IGO"). *See* COMAR 12.07.01.05.B; *see also* C.S. § 10 206. Complaints are reviewed preliminarily by the IGO. *See* C.S. § 10-207; COMAR 12.07.01.06. If the IGO determines that the complaint is not "wholly lacking in merit on its face," C.S. § 10-208(c), it refers the matter to the Maryland Office of Administrative Hearings ("OAH"), for a hearing to be conducted by an administrative law judge ("ALJ"). *See* C.S. § 10-208; COMAR 12.07.01.07-.08.

A decision of an ALJ that dismisses an inmate's grievance in its entirety is considered a final agency determination. *See* C.S. § 10-209(b)(1). On the other hand, an ALJ's decision concluding that the inmate's complaint is wholly or partly meritorious constitutes a recommendation to the Secretary of DPSCS, who is entitled to adopt or reject the ALJ's recommendation, in whole or in part. *See* C.S. § 10-209(b)(2), (c).

A prisoner is entitled to judicial review of the final agency determination in a Maryland circuit court. C.S. § 10-210(b)(1). The review is not a de novo proceeding, however. Instead, it is based on the administrative record. *See* C.S. § 10-210(b)(3). A party (the inmate or DPSCS) "aggrieved" by the circuit court's decision may apply to the Maryland Court of Special Appeals for leave to appeal. C.S. § 10-210(c)(2). Following a decision of the Court of Special Appeals, a party may petition the Maryland Court of Appeals for a writ of certiorari. *See* Md. Code (2006 Repl. Vol., 2012 Supp.), §§ 12-201 & 12-202(3) of the Courts & Judicial Proceedings Article ("C.J."); *see also Stachowski v. State*, 416 Md. 276, 6 A.3d 907 (2010) (discussing scope of limitations on certiorari jurisdiction in cases subject to C.J. § 12-202, where review by the Court

of Special Appeals is conditioned on leave to appeal).

In this case, the State Defendants have submitted the declaration of Sergeant Jeffrey C. Shimko, the ARP Officer at WCI, who attests that he has searched the records of the WCI Administrative Remedy Office and found no ARP requests filed by Johnson concerning the matters at issue in this case. ECF 20, Exhibit 1. Johnson has not responded to the evidence establishing his failure to exhaust administrative remedies. Therefore, summary judgment will be entered in favor of the State Defendants.

Alternatively, summary judgment in favor of the State Defendants is appropriate on other grounds, discussed below.

## 2. Eleventh Amendment Immunity

The Eleventh Amendment bars suit against a state official in his official capacity where, as here, the suit is essentially to recover money from the state. In such cases, state officials may invoke Eleventh Amendment immunity because the state is the real party in interest. The Supreme Court has said: "A suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304 (1989); *see Brandon v. Holt*, 469 U.S. 464, 471-72 (1985). Put another way, states and their officers, sued in their official capacities, are not "persons" subject to suit for money damages under § 1983. *Will*, *supra*, 491 U.S. at 71.

Absent consent, the Eleventh Amendment precludes suit in federal court against a state by its own citizens. *See Board of Trustees of University of Alabama v. Garrett*, 531 U.S, 356 (2001). Although the State of Maryland has waived its sovereign immunity for certain types of cases brought in State courts, *see* Md. Code (2009 Repl. Vol.), State Gov't Article, § 12–202(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court with

respect to claims under § 1983.

### 3. *Failure to State a Claim and Respondeat Superior*

Johnson claims Maynard, the Secretary of DPSCS, and Morgan, then the Warden at WCI, are liable for his injuries because they failed to protect him from harm inflicted by another inmate and then allowed medical providers to furnish inadequate treatment. To state a cause of action against the State Defendants under 42 U.S.C. § 1983, plaintiff must allege a violation of a federal constitutional right or a right secured by federal law. *Baker v. McCollan*, 443 U.S. 137 (1979).

The State Defendants challenge any claims against them in their individual capacities, arguing that plaintiff has failed to allege any facts to support liability. They observe that the Complaint is completely devoid of any specific factual allegations against either Maynard or Morgan, and it fails to assert any theory of liability under which they could be found responsible for plaintiff's alleged damages. In particular, the Complaint does not suggest that either Maynard or Morgan had any personal involvement in regard to the assault or the resulting medical treatment.

The "Eighth Amendment protects a convicted inmate from physical harm at the hands of fellow inmates resulting from the deliberate or callous indifference of prison officials to a specific known risk of such harm." *Pressley v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987). In order to prevail on an Eighth Amendment claim of failure to protect from violence, Johnson must establish that these particular defendants exhibited "deliberate or callous indifference" to a "specific known risk of harm." *Id.*

"Prison conditions may be restrictive and even harsh, but gratuitously allowing the beating … of one prisoner by another serves no legitimate penological objective, any more than it squares with evolving standards of decency. Being violently assaulted in prison is simply not

10

part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994) (citations omitted). Nevertheless, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837; *see also Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 302-03 (4th Cir. 2004); *Rich v. Bruce*, 129 F.3d 336, 339–40 (4th Cir. 1997).

Negligent failure by a prison official to protect an inmate from attack by another inmate, does not state a claim under the Eighth Amendment. *See Pressly*, 816 F.2d at 979. The Eighth Amendment's deliberate indifference standard protects an inmate only where it is shown that prison officials either intended for the inmate to be harmed or they knowingly disregarded an obvious threat to such an extent that one can only assume the officials intended the threat to be carried out. A prison official is liable under this standard only if he knew that an inmate faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to avoid it. *See Farmer*, 511 U.S. at 825.

Of import here, the law in the Fourth Circuit is well settled that the doctrine of respondeat superior does not apply in § 1983 claims. *See Monell v. New York Dep't of Soc. Serv.*, 436 U.S. 658, 691 (1978); *Love–Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). Rather, individual liability must be based on personal wrongdoing or supervisory actions that violate constitutional norms. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.), *cert. denied*, 513 U.S. 813 (1994); *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985); *see also Foote v. Spiegal*, 118 F.3d 1416, 1423 (10th Cir. 1997).

Plaintiff does not allege facts that amount to personal wrongdoing by the State

Defendants. To establish supervisory liability against a warden or others under § 1983, a plaintiff must show: "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff'; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw,* 13 F.3d at 799. The *Shaw* Court also said, *id.* (internal citations omitted):

> To satisfy the requirements of the first element, a plaintiff must show the following: (1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff. . . . Establishing a "pervasive" and "unreasonable" risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury.

In the context of medical care, the plaintiff generally must show that: (1) the supervisory defendant failed promptly to provide an inmate with needed medical care; (2) the supervisory defendant deliberately interfered with the prison doctors' performance; or (3) the supervisory defendant tacitly authorized or was indifferent to the prison physicians' constitutional violations. *See Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990); *see also Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984).

As non-medical supervisory prison officials, defendants were entitled to rely on the medical judgment and expertise of prison physicians and medical staff concerning the course of treatment necessary for inmates. *See Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir.1995); *Miltier*, 896 F.2d at 854–55 (stating supervisory prison officials are entitled to rely on professional judgment of trained medical personnel and may be found to have been deliberately indifferent by intentionally interfering with an inmate's medical treatment ordered by such personnel).

Johnson does not allege facts or provide evidence to suggest that either defendant is subject to individual supervisory liability based on the conduct of other employees in implementing prison policy or the creation of corrections policy. The State Defendants are entitled to summary judgment.[8]

### C. Medical Defendants

#### 1. Corizon, Inc.

The claims against Corizon are also based on respondeat superior, as Johnson does not set forth any facts to show the corporate contractor had knowledge of the alleged misconduct of defendants Greg Flury, P.A., Janice Gilmore, R.N., or Ava Joubert, M.D. As noted, the doctrine of respondeat superior does not apply in § 1983 claims, and there is no basis for a claim against Corizon predicated on supervisory liability. Therefore, summary judgment shall be entered in favor of Corizon.

#### 2. Defendant Gilmore

Johnson does not allege facts demonstrating that Gilmore was involved in his medical treatment, nor do his medical records show that she participated in the matters at issue. ECF 1 at 6. Further, to the extent that plaintiff has sued Gilmore on the basis of respondeat superior, he fails to state a cognizable cause of action against her under § 1983. Accordingly, summary judgment shall be entered in favor of Gilmore.

#### 3. Defendants Flury and Joubert

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173

---

[8] In light of these determinations, the court need not reach the State Defendants' qualified immunity defense.

(1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

In order to state an Eighth Amendment claim based on denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Farmer v. Brennan*, *supra,* 511 U.S. at 834; *Estelle v. Gamble*, 429 U.S. 97 (1976); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff members were aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *Farmer,* 511 U.S. at 837.

A "serious medical need" refers to a medical need "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (citing *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)). Proof of an objectively serious medical condition, however, does not end the inquiry. The second component of proof requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839.

Deliberate indifference to a serious medical need "describes a state of mind more blameworthy than negligence." *Id*. at 835. It requires proof that the prison official knew of or was aware of the inmate's need for medical attention and disregarded an excessive risk to the inmate's health or safety. *Id*. at 837. Put another way, for liability to attach based on a violation of the Eighth Amendment, the law "requires consciousness of a risk...." *Id*. at 840. "Actual knowledge or awareness on the part of the alleged inflicter ... becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said

to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

In *Farmer*, the Supreme Court rejected an objective test for deliberate indifference. 511 U.S. at 837; *see Wilson v. Seiter*, 501 U.S. 294, 303 (1991). The *Farmer* Court held that "a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. The *Farmer* Court added that it is enough for an Eighth Amendment claimant to show that "the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id*. at 842. The Fourth Circuit has said: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997).

Even if the requisite subjective knowledge is established, however, a prison official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998)).

Of import here, "any negligence or malpractice on the part of ... doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998). Without evidence that a doctor ignored symptoms linked to a serious medical condition of which the doctor was aware, the subjective knowledge required for Eighth Amendment liability is not present. *See id*. at 169 (actions inconsistent with an effort to hide a serious medical condition refute presence of doctor's subjective knowledge). Moreover, disagreements between medical staff and an inmate as to the necessity for, or the

manner or extent of, medical treatment do not rise to a constitutional injury. *See Estelle v.*
*Gamble*, *supra*, 429 U.S. at 105-06; *Wright v. Collins*, 766 F.2d at 849; *Russell v. Sheffer*, 528
F.2d 318, 319 (4th Cir. 1975). Nor do inmates have a constitutional right to the treatment of
their choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). *See Hudson v. McMillian*,
503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified
access to health care).

In this case, Johnson claims Flury, a physician's assistant, demonstrated "deliberate
indifference when he allowed an infection to cause [Johnson's] left tonsil to become locked from
staph infection" and denied him from being "seen by an outside medical consultant for over a
year when he was well aware that [Johnson] was in need of serious medical care." ECF 1 at 6-7.
As to Joubert, he alleges that, "as the medical director of WCI," she failed "to provide proper and
adequate medical care," thereby causing him "undue pain and suffering for over a year. ECF 1
at 5.

Johnson's medical records as of December 22, 2010, the date on which he was stabbed in
the jaw, show he was treated on December 22, 2010, by Tracy McGraw, R.N. for bleeding on the
left side of his face as a result of a laceration approximately 3 centimeters along the side of his
lower jaw. ECF 13, Exhibit 2.[9] The medical chart indicates Johnson was in no distress, his
lungs were clear, and no other injuries were observed. *See id.* Colin Ottey, M.D. closed the
laceration with Dermabond, a sterile liquid skin adhesive. In addition, Johnson was given a
tetanus shot to prevent infection and SoluMedrol, an anti-inflammatory medicine. *See id.* The
wound was scheduled for a recheck the following morning. *See id.* Johnson was instructed to
submit a sick call slip if symptoms of infection developed. *See id.*, Exhibit 3.

---

[9] The Medical Defendants denote each page of the medical records as a separate exhibit.

On December 28, 2010, Flury examined Johnson's wound. *See id.*, Exhibits 4-6. Johnson reported increased pain and swelling and complained of a sore throat and nasal congestion. Johnson's examination revealed no swelling or tenderness to his sinus area. *See id.* The laceration had healed to one centimeter in length. Flury cleaned and dressed the wound and recorded the "laceration to [Johnson's] left jawline was healing well" and that there was "no sign of active inflammation or infection." *Id.* Flury prescribed Motion for pain, Vibramycin,[10] an antibiotic, Aprodine, a cold and allergy medication, and Guaifenesin, a medication used to clear mucous and congestion. *Id.*

Johnson was seen for treatment of his diabetes on February 11, 2011. *See id.*, Exhibits 7-9. Johnson expressed no complaints concerning infection, throat pain, or cold or viral symptoms. *See id.* Johnson's examination revealed no nasal deformity, his mucous membranes were normal, and his tongue and throat were normal in appearance. *See id.*

Johnson first raised concerns about infection during a medical visit on March 14, 2011. *See id.*, Exhibit 10. He informed Beverly Sparks, P.A that "he knows he has an infection due to his continued need to spit." *Id.* Plaintiff stated he was not able to take the full course of antibiotics when ordered on December 28, 2010, because he was placed on "lock-up and meds were locked up with his belongings."[11] Johnson's exam showed no signs of distress, facial edema, or fever. *Id.* No infection was documented and Johnson was advised of these results. *Id.* The record shows "[p]atient became upset when this provider attempted to educate him about infection." *Id.*

_____

[10]The generic name for Vibramycin is doxycycline. *See* http://www.nlm.nih.gov/ medlineplus/ druginfo/meds/ a682063.html.

[11] Johnson did not inform medical providers about his allegedly limited access to the prescribed antibiotic regimen until some ten weeks later. The complaint is silent about Johnson's purported "lock-up" status or the length of time he spent without his medication.

On April 5, 2011, Johnson was seen at the Chronic Care Clinic for his diabetes where he told Lisa Schindler, P.A. that "his face…became infected" as a result of being stabbed and he was "spitting excessive amts [sic] of 'brown'…spit" at night. *Id*., Exhibit 12. He also reported having a bad taste in his mouth. *See id.* Johnson indicated that he had been prescribed an antibiotic at the time of his injury, but the medication was "locked in his property." *Id*. The medical record states: "Pt [patient] is convinced that his issue will be resolved if he can take this antibiotic." *Id*. The medical record shows Johnson's face was not symmetrical, he was positive for a "lump" in the throat, and he was experiencing pain on his left cheek. *See id.* Vibramycin was prescribed again, and it was noted that plaintiff would be rechecked to see if his "issue resolves." *See id.,* Exhibits 12-14.

Johnson presented no complaints related to the infection until May 6, 2011, when he complained of a sore throat and chest pain.[12] His medical chart records no signs of distress, redness or swelling, and he was able to swallow without difficulty. *See id*., Exhibit 20.

On May 11, 2011, Johnson reported the "muscles in [his] throat are locking and that he constantly had 'mucous like' spit." *Id*. Exhibits 22-23. No cough, congestion, breath odor, or swollen lymph nodes were noted. Johnson had white patches on his tongue. *See id.*, Exhibit 22. Beverly Sparks, P.A. prescribed Amoxicillin, an antibiotic. Johnson told her that he doubted Amoxicillin would help his symptoms.[13] *See id.* In light of Johnson's history of failing to comply with his diabetes medication regimen, Sparks directed medical providers to watch Johnson while he ingested the Amoxicillin. *See id.,* Exhibit 22.

---

[12] Plaintiff was seen for complaints unrelated to the issues herein in the interim. ECF 2 at 17-19.

[13] Johnson did not indicate his reasons for discounting the benefit of Amoxycillin. On January 25, 2012, he told a medical provider that Amoxycillin had helped him in the past.

On May 30, 2011, Johnson again complained of throat problems. He stated that he "need[s] some test because my problems are not normal." *Id.*, Exhibit 24. Johnson continued to report "ongoing problem[s] with his throat." *Id*; Exhibits 27-28. On June 4, 2011, an exam of his throat showed no redness, drainage, or swelling. *Id.*

On June 6, 2011, Johnson presented complaints of allergy congestion and was prescribed Nasarel, a corticosteroid used to treat allergies. *See id.*, Exhibits 29-34. On June 17, 2011, he reported worsening symptoms over the last two to three months. *See id.*, Exhibit 35. He told Deidre Mull, N.P. that the medication was helping his nasal congestion but he still had sinus congestion. *See id.*, Exhibits 34-36. Mull prescribed Claritin, an antihistamine.

Johnson went to the Chronic Care Clinic on June 24, 2011, for diabetes treatment. He presented no complaints of throat-related problems. *See id.*, Exhibit 38.

On September 29, 2011, Johnson failed to attend a scheduled medical appointment in the Chronic Care Clinic and was listed as a "no show." *See id.*, Exhibit 41. Johnson refused to come to an appointment on October 11, 2011. *See id.*, Exhibit 42. On November 16, 2011, he declined the seasonal flu vaccine. *See id.*, Exhibit 46.

Johnson did not voice complaints of a sore throat or cold symptoms again until December 1, 2011, when he reported difficulty swallowing, nasal congestion, and coughing green mucous. *See id.*, Exhibits 47-48. Lori Schafer, R.N. examined his throat and found mild to moderate swelling of the throat and increased redness of his tonsil and lymph nodes. *See id.* She notified Dr. Ottey, who prescribed Amoxicillin and Aprodine. *See id.*

On December 3, 2011, Johnson was treated for stab wounds incurred in another assault. He was given ointment for his wounds and a tetanus shot was ordered. He denied the need for any further medical care. *See id.*, Exhibit 49.

Johnson was treated on December 17, 2011, for complaints of a sore throat and an infection in his left tonsil. *See id*., Exhibits 51-52.[14] He was given a saline gargle and advised to increase fluid intake. *See id*.

Johnson was a "no show" for his appointment at the Chronic Care Clinic on January 3, 2012. *See id*., Exhibit 52. He was treated on January 12, 2012, for minor lacerations after he was involved in a possible fight with other inmates. *See id*., Exhibits 54-55. Johnson voiced no complaints relevant to issues in this case.

On January 25, 2012, Johnson complained of throat discomfort to Katie Winner, P.A.. The medical chart indicates: "pt states that he has been having throat discomfort since 2010. He states that it feels like there is something in his throat. Assoc. sx are PND, fullness in throat, and brown d/c from nares [sic]." *Id.*, Exhibit 56. Johnson denied trouble swallowing, a scratch or itchy throat, or difficulty breathing. He indicated Amoxicillin had helped him in the past. *See id*. Amoxicillin and Aprodine were prescribed to address Johnson's symptoms. *See id*.

On January 31, 2012, Joubert treated Johnson for a rib fracture sustained after an assault. *See id*. Exhibits 62-63. This is the first time he was treated by Joubert during the time relevant to the complaint. Johnson complained of sinus drainage during the visit, and was advised to "use mouthwash gargles as often as possible." *Id.*

Flury examined Johnson on February 1, 2012, in response to complaints of throat and sinus discomfort and difficulty swallowing. Flury diagnosed Johnson with pharyngitis.[15] At the time, Johnson was on a course of Amoxicillin. *See id*., Exhibit 64.

---

[14] The record states that Johnson "was seen in medical and given amoxil blister pkg [sic] but the nurse tore the top off of stock med card and the CO [correctional officer] took it b/c [because] it didn't have his name on it." ECF 13, Exhibit 51.

[15] Pharyngitis is discomfort, pain, or scratchiness in the throat caused by swelling (inflammation) of the pharynx,
which is in the back of the throat, between the tonsils and the voicebox (larynx). *See*

Johnson was treated by Dr. Joubert for diabetes on February 6, 2012. He presented no complaint of pain at this visit. *See id.*, Exhibit 67. Indeed, Johnson did not again complain of any relevant symptoms until April 27, 2012, when he reported sinus congestion. *See id.*, Exhibits 82-85. His exam was unremarkable and he was advised to continue taking his medications. *See id.*

On May 15, 2012, Flury ordered a throat culture to further evaluate Johnson's complaints of nasal and throat discomfort. *See id.*, Exhibit 86-88. The test results, obtained on June 2, 2012, revealed "a few colonies of staph" infection. *See id.*, Exhibits 90-91.[16] The medical notes of the visit indicate Johnson said he "had a throat culture a couple of weeks ago, I still have pain in my throat and no one has followed up with me." *Id.* Bactrim to treat the infection and Guifenasin to clear mucous and congestion in the throat and chest were ordered. *See id.*

On June 13, 2012, Johnson refused treatment. *See id.*, Exhibit 92. On July 14, 2012, Johnson complained to Flury of a sore throat despite courses of Bactrim and "cipro," but he denied difficulty swallowing. *See id.,* Exhibit 94.[17] Flury referred Johnson for a physician evaluation "due to failed midlevel conservative mgmt". *Id.*, Exhibit 95.[18]

Johnson was treated by Dennis Martin, R.N. on August 3, 2012, for "sore throat/staph infection." *Id.*, Exhibits. 98-99. Johnson was advised to continue his current treatment plan. *See id.* The medical notes state he would be referred to a physician. *See id.*, Exhibit 98.

---

http://www.nlm.nih.gov/ medlineplus/ency/article/000655.htm.

[16] The staph findings are temporally remote from the care Johnson received for his lacerations on December 22, 2010.

[17] "Cipro" or Ciproflaxacin is an antibiotic. *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a688016.html.

[18] It appears that physician consultation occurred on August 8, 2012.

On August 8, 2012, Johnson had an appointment with Joubert. He reported that he "feels something always in his throat" and "cold sweats." *Id.*, Exhibit 102. Examination found Johnson was in no distress, his tongue was normal, and there were no mucous abnormalities. *See id.* Exhibits 102-103. Joubert ordered a course of Bactrim, Ocean (a spray used to relieve nasal dryness), and a mouth rinse. On August 16, 2012, Flury cancelled an appointment for Johnson's sore throat as "superfluous," because Johnson had been evaluated for the same complaint by a physician on August 8, 2013. *See id.* Exhibit 107.

Johnson was treated for throat irritation on August 22, 2012. *See id.*, Exhibits 109-111. His uvula[19] was larger than normal and that his left tonsil was "slightly" enlarged. *See id.*, Exhibit 109. But, no reddening of the throat, airway difficulty, or acute distress was noted. *See id.* The medical record states: "Inmate is not responding to nursing protocol and is referred back to provider for same reason." *Id.*

On August 28, 2012, Flury treated Johnson for persistent throat irritation. *See id.*, Exhibits 112-114. Johnson indicated that he had no difficulty swallowing. Flury reviewed the previous lab results and observed "mild normal flora" were shown. *Id.*, Exhibit 113.

Johnson filed the instant complaint on September 7, 2012. He complained of throat discomfort on October 3, 2012, when an exam revealed some redness of his pharanx but no swelling. *See id.*, Exhibits 117-123. Defendants' records indicate that medical providers continued to evaluate and treat his complaints of sore throat symptoms and diabetes until his transfer to the Maryland Correctional Training Center. *See id.*, Exhibits 117-123.

Judged in the light most favorable to Johnson, the record shows numerous and continued efforts by defendants to treat Johnson's medical concerns. A variety of medications were

---

[19] The uvula is a fleshy extension at the back of the soft palate that hangs above the throat. *See* http://oxforddictionaries.com/us/definition/american_english/uvula.

prescribed and alternative methods of care were attempted. Johnson was seen by medical doctors, nurses, and physicians' assistants for his medical care. Flury and Joubert's treatment of Johnson was relatively brief compared to the overall course of his medical care for these symptoms, and there is simply no evidence that Flury or Joubert disregarded an excessive risk to his health or safety amounting to deliberate indifference to serious medical needs.

In granting summary judgment to defendants, the court does not imply that Johnson is not entitled to medical treatment for his sore throat symptoms. The right to treatment, however, is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added). The undisputed evidence is that the Johnson's complaints were considered, treated, and monitored. Indeed, there is evidence that Johnson had on some occasions refused medical care or failed to comply with his medically prescribed regimen.

Clearly, the complaint reflects Johnson's frustration with his chronic symptoms. But, as noted, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, *supra*, 766 F.2d at 849 (*citing Gittlemacker v. Prasse,* 428 F.2d 1, 6 (3rd Cir. 1970)). Although the court does not minimize plaintiff's frustration or the severity of his condition, it is impossible on this record to find evidence of deliberate indifference or other exceptional circumstances so as to warrant an Eighth Amendment violation. Consequently, summary judgment will also be entered in favor of defendants Flury and Joubert.[20]

---

[20] To the extent that plaintiff seeks to allege any state law claims, the court declines to exercise supplemental jurisdiction over them, pursuant to 28 U.S.C. § 1367(a). Claims of medical negligence with regard to plaintiff's care are not reviewable under the Eighth Amendment, because negligence is not actionable under 42 U.S.C. § 1983. *See Davidson v.*

## CONCLUSION

For these reasons, the court will grant the Motions for Summary Judgment filed by the State and Medical Defendants. A separate Order, consistent with this Memorandum, follows.


<u>August 12, 2013</u>                    <u>/s/                       </u>
Date                                         Ellen Lipton Hollander
                                             United States District Judge

---

*Cannon,* 474 U.S.344, 347-48 (1986); *Daniels v. Williams,* 474 U.S. 327, 333-34 (1986); *Estelle,* 429 U.S. at 106. Moreover, prior to bringing a medical malpractice claim under Maryland law, plaintiff must comply with the requirements of Maryland's Health Care Malpractice Claims Act ("HCMCA"). *See* Md. Code (2006 Repl. Vol., 2012 Supp.), § 3-2A-01 of the Courts and Judicial Proceedings Article ("C.J."). Of import here, he must exhaust his medical malpractice claim before the Maryland Health Claims Alternative Dispute Resolution Office as a condition precedent to any judicial action. *See* C.J. § 3-2A-02; *Carroll v. Konits*, 400 Md. 167, 172 (2007). This exhaustion requirement applies to claims of medical malpractice filed in federal courts. *See Davison v. Sinai Hospital of Baltimore, Inc.,* 462 F. Supp. 778, 779-81 (D. Md. 1978*); Lewis v. Waletzky*, 576 F. Supp. 732, 736-387 (D. Md. 1978). *See, e.g., Oxtoby v. McGowan*, 294 Md. 83, 447 A.2d 860, 864-65 (1982) (holding that the condition precedent of exhaustion does not take away the subject matter jurisdiction of a state circuit court to hear and render judgments in cases involving claims that fall within the Health Care Malpractice Claims Act).